UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| TECHNOLOGY LICENSING CORPORATION, a Nevada Corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>THOMSON, INC., a Delaware Corporation,<br><br>  Defendant.<br>_____/ | NO. CIV. 2:03-1329 WBS PAN<br><br>MEMORANDUM AND ORDER RE:<br>MOTION FOR CLAIM CONSTRUCTION |

----oo0oo----

Technology Licensing Corporation ("TLC") owns U.S. Patent Nos. RE40,411 E (the "'411" patent) and RE40,412 E (the "'412" patent). The patents relate to identifying and separating the synchronizing signal component of a video signal, which allows televisions to accurately reproduce the image that was transmitted to it over the airwaves. Plaintiff contends that three of Thomson, Inc.'s ("Thomson") products violate plaintiff's patents by incorporating three different sync separator chips

1

that practice plaintiff's patents.  (Def. Thomson's Opening
Markman Brief Ex. E, at 4.)

On February 1, 2010 the parties submitted their claim construction briefs and the court conducted a Markman[1] hearing on March 1, 2010 on the limited issue of whether the terms "circuit" and "circuitry" constitute means-plus-function limitations. After considering the parties' briefs and all other relevant documents, along with the parties' arguments at the Markman hearing, the court construes the disputed claims as set forth below.

I.  Factual and Procedural Background

TLC is the holder of the '411 and '412 patents, which are July 1, 2008 reissues of U.S. Patent Nos. 5,745,250 (the "'250 patent"), and 5,486,869 (the "'869 patent"), respectively. The '869 patent was issued from application No. 07/837,323, filed on February 18, 1992.  (Szpondowski Decl. Ex. B., at 1.)  The '250 patent was issued from a continuation-in-part application of application No. 08/493,661, filed on June 22, 1995, which was a continuation-in-part of application No. 07/837,323 which eventually became the '869 patent.  (Id. Ex. A., at 1.)  The '411 patent comprises "a method and apparatus for identifying and separating the synchronizing signal component of video like signals by identifying or detecting the arrangement or sequence of the known occurrances [sic] of events or patterns of the synchronizing signal component" and the '412 patent "provides a synchronizing signal separation."  (Id. Ex. A, at 1, Ex. B, at

---

[1] Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

2

1.)

Images and sounds captured by television cameras are transmitted to televisions via composite video signals, which must then be accurately reproduced on the television screen. A synchronization signal (also referred to as "sync signal" or "sync pulse") within the composite video signal allows televisions to accurately reproduce transmitted images by indicating the beginning of the information for each line on the television screen. The synchronization signal indicates this information through changes in its voltage level, and the sync signal must be extracted from the composite signal in order for the television to accurately reproduce the transmitted image.

The '411 and '412 patents relate to identifying and separating the sync signal component of a composite video signal in order to allow accurate reproduction of the transmitted image. A typical sync signal is a downward (negative) pulse that is preceded by a "front porch" interval and followed by a "back porch" interval. In order to identify and separate the sync signal, the '411 and '412 patents outline two steps. First, the "tip," or negative peak of the sync pulse (known as the "sync tip"), is "clamped," or brought down to a known voltage level, by adding current to or draining current from the signal. Second, the clamped sync pulse is "sliced" by comparing it to a "slicing voltage," which is typically found between the sync tip and the "back porch" interval of the sync signal. The sync separator produces a logic level sync signal that departs from its usual level when the video signal is below the slicing voltage--that is, when a sync pulse is present.

At issue in this litigation are three different sync separator chips that Thomson incorporates into three of its products: 1) the Elantec EL4583 chip in its LDK 5301 product; 2) the Gennum 4882 chip in its FSS 8900 product; and 3) the Elantec EL4511 chip in its 8900 GEN-SM product. (Def.'s Opening Markman Brief Ex. E, at 4.) On June 20, 2003, TLC filed suit in this court alleging that each of these products violate claims in the '250 and '869 patents through incorporation of the three chips, each of which practice the patents-in-suit. The action was twice stayed pending resolution of a related case in the United States District Court for the Northern District of California[2] and pending completion of patent reissue proceedings for the '250 and '869 patents on October 3, 2003, and September 20, 2004, respectively. (Docket Nos. 24, 50.) On September 11, 2009, Thomson filed an unopposed motion to lift the September 20, 2004 stay in the instant action, which was granted. (Docket Nos. 221, 225.) TLC filed a Second Amended Complaint on January 21, 2010 which substituted the '411 and '412 reissue patents for the '250 and '869 patents. (Docket No. 240.) Presently before the court are the parties' motions for claim construction.

As submitted in their briefs, the parties agree on the construction of two patent terms (Szpondowski Decl. Ex. C), dispute the construction of forty terms (Id. Ex. D), and agree that twenty-nine terms should be construed as having a plain and ordinary meaning to one of skill in the art (Id. Ex. E). The parties also dispute whether twenty-one claims in the '411 patent

---

[2] Tech. Licensing Corp. v. Videotek, Inc., No. 01-4204.

4

containing the term "circuit" or "circuitry" constitute means-plus-function limitations,[3] and agree that several other terms in the patents constitute means-plus-function limitations that require identification of their function and structure (Id. Ex. H).

II. Discussion

A. Legal Standard

The court, not the jury, must determine the meaning and scope of patent terms. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd., 517 U.S. 370, 372 (1996). When construing disputed claim terms, the court often looks to both intrinsic and extrinsic evidence. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Intrinsic evidence includes the language of the claims, specification, and prosecution history. Vitronics, 90 F.3d at 1582. The language of a patent's claims are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question . . . as of the [patent's] effective filing date." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of

---

[3] While plaintiff's exhibit H also identifies two terms in claims 35 and 36 of the '412 patent as a disputed "circuitry" means-plus-function term, neither of the parties subsequently or elsewhere mention these two terms as in dispute. Rather, the parties repeatedly refer to the "circuit" or "circuitry" terms at issue in the present litigation as being found in the '411 patent.

5

the entire patent, including the specification." Id.

The specification "is the single best guide to the meaning of a disputed term." Vitronics, 90 F.3d at 1582. The specification can provide further guidance on the meaning of terms in the claims by, for example, (1) revealing a "special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," Phillips, 415 F.3d at 1316, (2) revealing an "intentional disclaimer, or disavowal, of claim scope by the inventor," id., or (3) defining a term by implication, "such that the meaning may be found in or ascertained by a reading of the patent documents," Novartis Pharms. Corp. v. Abbott Labs., 375 F.3d 1328, 1334-35 (Fed. Cir. 2004). Limitations from the preferred embodiments or specific examples in the specification, however, cannot be read into the claim. Anchor Wall Sys. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298, 1306 (Fed. Cir. 2003).

The patent's prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317. The doctrine of prosecution disclaimer attaches only "where the patentee has unequivocally disavowed a certain meaning to obtain his patent," and will not attach where the alleged disavowal of claim scope is ambiguous. Omega Engr., Inc. v. Raytek Corp., 334 F.3d 1314, 1324, 1325 (Fed. Cir. 2003)

Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and

inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. When used, extrinsic evidence cannot "vary or contradict" claim language, Vitronics, 90 F.3d at 1584, but it can be useful "for a variety of purposes, such as to provide background . . . [and] to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." Phillips, 415 F.3d at 1318.

A patent claim or limitation can be expressed as a "means . . . for performing a specified function without the recital of structure, material or acts in support thereof." 35 U.S.C. § 112(6). Claims expressed in this "means-plus-function" format are "construed to cover the corresponding structure . . . described in the specification and equivalents thereof." Id. Where a claim "recites a function, but then goes on to elaborate sufficient structure . . . within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format." Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1427-28 (Fed. Cir. 1997).

Claims that do not use the word "means" enjoy a rebuttable presumption that they are not in means-plus-function format and that 35 U.S.C. § 112(6) does not apply. Watts v. XL Sys. Inc., 232 F.3d 877, 877 (Fed. Cir. 2009). This presumption can be rebutted when the term "nonetheless relies on functional terms rather than the structure or material to describe performance of the claimed function." Micro Chem., Inc. v. Great

7

Plains Chem. Co., 194 F.3d 1250, 1257 (Fed. Cir. 1999).

Once it is established that a claim or limitation is in means-plus-function format, courts interpret the claim in a two-step process. First, the claimed function of the means-plus-function claim or limitation must be identified. Next, the structure for the "means" limitation must be defined. The structure must be disclosed in the specification or prosecution history, clearly linked to the stated function, and necessary to perform that function. Omega Engr., 334 F.3d at 1321. The duty to link structure in the specification to the recited function is the trade-off in convenience for listing claims or limitations in means-plus-function format.

B. Agreed Constructions

The parties agree to and the court will therefore adopt the construction of the two terms in the '411 patent below:

1. Delayed version thereof (claims 9, 12, 13)

Delayed version of the marking signal.

2. Responsive to (claim 1)

A response that is dependent on that to which it is responsive.

C. Terms the Parties Agree the Court Should Use the Plain and Ordinary Meaning To One of Ordinary Skill in the Relevant Art

The parties agree that twenty-nine terms should be construed as having a plain and ordinary meaning to one of skill in the art (Szpondowski Decl. Ex. E). The court will adopt the parties' constructions in full.

D. The Meaning of "Circuitry"

Thomson argues that twenty-one uses of the words "circuit" and "circuitry" in the '411 patent are means-plus-function limitations. Because none of the terms use the word "means," the parties agree that there is a rebuttable presumption that the terms are not means-plus-function limitations and that 35 U.S.C. § 112(6) does not apply. Thomson presents two arguments in favor of rebutting the presumption: first, that the inventor of the patents unequivocally asserted during the patent prosecution that the terms were means-plus-function in order to overcome the prior art; and second, that it was previously decided in <u>Technology Licensing Corp. v. Gennum Corp.</u>, No. 01-4204, 2007 U.S. Dist. LEXIS 35521 (N.D. Cal. May 4, 2007), that "circuitry" is a means-plus-function limitation and TLC is thus collaterally estopped from arguing otherwise. The court will address each argument in turn.

### 1. <u>Prosecution Disclaimer</u>

In order for prosecution disclaimer to attach, the alleged disavowing actions or statements must be "both clear and unmistakable." <u>Omega Engr.</u>, 334 F.3d at 1326. The statements must be both "so clear as to show reasonable clarity and deliberateness" and "so unmistakable as to be unambiguous evidence of disclaimer." <u>Id.</u> at 1325 (citing cases). On June 10, 1994, inventor and applicant J. Carl Cooper responded to the Patent Office's rejection of then pending Claims 29-33 of the application that resulted in the '869 patent in view of the prior art under 35 U.S.C. § 102. Cooper told the Patent Examiner:

> Applicant wishes to call the examiner's attention to the USPTO guidelines for interpreting Means or Step plus Function limitations in claims, which was

> published in the May 17, 1994 Official Gazette. It is believed that this guideline is pertinent with respect to the present objections. Specifically, the examiner's [sic] would appear to be giving an overly broad interpretation of the claim language when arguing that the claims cover the cited prior art as discussed below.

(Def.'s Opening Markman Brief Ex. D, at 15.) Claims 29-33 were added to the patent application in a December 9, 1993 amendment, and primarily comprise "circuitry responsive to" and "circuitry for" various events and purposes. (See Szpondowski Decl. Ex. R.) In his discussion of claims 29-33, Cooper repeatedly distinguishes the claimed invention as "structurally and functionally different" from the prior art, "which differences are believed pertinent under the new examination guidelines." (See Def.'s Opening Markman Brief Ex. D, at 17-18.)

Cooper later cancelled those claims in a June 16, 1995 amendment, (Szpondowski Decl. Ex. K, at 2), and they do not appear in either the '250 or '869 patents. This is not, however, dispositive of whether Cooper intended to broadly disclaim "circuit" and "circuitry" as means-plus-function limitations. See Adept, Inc. v. Murex Sec. Ltd., 539 F.3d 1354 (Fed. Cir. 2008). Because Cooper's response occurred before he filed the continuation-in-part that resulted in the '250 patent, this aspect of the prosecution history is shared by both the '250 and '869 patents and may be relevant to construing both patents and their reissues.

The seemingly broad language quoted above cannot be said to clearly, unmistakably and unambiguously disclaim the term "circuit" and "circuitry" as a means-plus-function limitation for

10

all such recitals currently at issue in the eventual '250 patent. See Omega Engr., 334 F.3d at 1326. While the above language seems to broadly argue for means-plus-function treatment of then-claims 29-33 of the application that led to the '869 patent, the court finds it telling that Thomson has no other evidence from the prosecution history to support its position that Cooper similarly intended to limit the claims at issue in the '250 patent. Cooper does not specifically refer to any term in claims 29-33 as a means-plus-function limitation, and Cooper does not appear to assert that those terms are in means-plus-function form. Similarly, Thompson provides no evidence from the prosecution history that the patent examiner mentioned means-plus-function limitations, § 112(6), or structures disclosed in the specification that would be necessary to support means-plus-function claims. Thomson certainly has not shown the court any other evidence from the prosecution history that would show either Cooper or the patent examiner considered the term "circuitry" in the '250 patent to be subject to § 112(6). Therefore the patent prosecution history will not suffice to rebut the presumption that the terms are not in means-plus-function form.

    2. Collateral Estoppel

    According to the doctrine of collateral estoppel or issue preclusion, a judgment on the merits in a first suit prevents relitigation of issues in a second suit if: 1) the issue is identical to the one decided in the first action; 2) the issue was actually litigated in the first action; 3) resolution of the issue was essential to a final judgment in the first action; and

4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. <u>Innovad Inc. v. Microsoft Corp.</u>, 260 F.3d 1326, 1334 (Fed. Cir. 2001). "If there is doubt, however, collateral estoppel will not be applied." <u>Davis & Cox v. Summa Corp.</u>, 751 F.2d 1507, 1518 (9th Cir. 1985). Even where the requirements for collateral estoppel are met, the decision to apply the doctrine is within the court's discretion. See <u>id.</u> at 1519.

In evaluating the application of collateral estoppel, courts may refer to the Restatement (Second) of Judgments. <u>Foster v. Hallco Manuf. Co., Inc.</u>, 947 F.2d 469, 480 (Fed. Cir. 1991); <u>Kamilche Co. v. United States</u>, 53 F.3d 1059, 1062 (9th Cir. 1995). The Restatement identifies four factors to be considered in determining whether an issue in a successive proceeding is identical to an issue previously litigated: (1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first; (2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding; (3) could the pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second; and (4) how closely related are the claims involved in the two proceedings. <u>Kamilche</u>, 53 F.3d at 1062; see <u>Applied Med. Res. Corp. v. U.S. Surgical Corp.</u>, 352 F. Supp. 2d 1119, 1124-25 (C.D. Cal. 2005).

TLC's infringement suit against Thomson is based in part on Thomson's use of the Gennum 4882 chip in its FSS 8900

12

product.  In Technology Licensing Corp. v. Gennum Corp., No. 01-4204, 2007 U.S. Dist. LEXIS 35521 (N.D. Cal. May 4, 2007) (the "Gennum Litigation"), TLC sued Gennum for violating patents including the '250 and '869 patents through, inter alia, the Gennum 4882 chip.  In a November 14, 2002 Order, Judge Breyer construed the term "circuit" and "circuitry" as used eleven times in three patents owned by TLC--including eight "circuitry" terms in claims 27 and 31 of the '869 patent--as means-plus-function limitations, Tech. Licensing Corp. v. Videotek, Inc., No. 01-4204, (N.D. Cal. Nov. 14, 2002) (Docket No. 158), which TLC did not challenge on appeal, Tech. Licensing Corp. v. Videotek, Inc. & Gennum Corp., 545 F.3d 1316, 1338 (Fed. Cir. 2008).  As one of Gennum's customers, Thomson is in privity with Gennum for preclusion purposes.  Schnitger v. Canoga Electronics Corp., 412 F.2d 628 (9th Cir. 1972).

At issue in this litigation is whether the terms "circuit" and "circuitry" as used in the '411 reissue patent of the '250 patent are means-plus-function limitations.  The Gennum Litigation did not address whether any "circuit" or "circuitry" terms in the '250 patent were means-plus-function limitations, and the construction of claims 27 and 31 of the '869 patent is not at issue in the present suit.  The issue before this court, however, is identical to the issue that was decided by Judge Breyer.  The argument that TLC and Thomson present to this court is also identical to the arguments presented to Judge Breyer: whether the terms "circuit" and "circuitry" by themselves disclose sufficient structure such that they may avoid § 112 (6) treatment.  While the case law of the Federal Circuit has changed

13

since Judge Breyer's 2002 claim construction ruling, the rule of law to be applied by the court in this case is the same as when it was applied by Judge Breyer.

Separate patents describe "separate and distinct [inventions]," 35 U.S.C. § 121, such that "it can not be presumed that related patents rise and fall together." Comair Rotron, Inc. v. Nippon Densan Corp., 49 F.3d 1535, 1539 (Fed. Cir. 1999). Yet as to the third and fourth factors articulated by the Restatement (Second) of Judgments, the court finds that the '869 and '250 patents are so closely related that TLC could have anticipated that Judge Breyer's construction of the term "circuitry" in the Gennum Litigation could apply to future suits on both the '250 and '869 patents or their reissues. "[T]he same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." Fin Control Sys. Pty, Ltd. v. OAM, Inc., 265 F.3d 1311, 1318 (Fed. Cir. 2001). While this principle is typically applied to claims occurring within the same patent, it applies with equal force to identical terms appearing in related patents. See Epcon Gas Sys. Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1031 (Fed. Cir. 2002) ("The same term or phrase should be interpreted consistently where it appears in claims of common ancestry.") The '869 and '250 patents share a common file and prosecution history and use the terms "circuit" and "circuitry" in an identical manner. The court therefore finds that the issue is identical to that previously decided by Judge Breyer.

The court finds that the other elements necessary for collateral estoppel to apply are also met. The parties to the Gennum Litigation fully briefed the issue of whether claims 27 and 31 of the '869 patent described "circuit" in means-plus-function format, and Judge Breyer issued a claim construction order that decided the issue. See <u>Tech. Licensing Corp. v. Videotek, Inc.</u>, No. 01-4204, (N.D. Cal. Nov. 14, 2002) (Docket No. 158). Judge Seeborg relied on the claim construction that claims 27 and 31 of the '869 patent were means-plus-function limitations when he determined that the Gennum chip did not infringe the '869 patent. <u>Tech. Licensing Corp. v. Gennum Corp.</u>, No. 01-4204, 2007 U.S. Dist. LEXIS 35521, at *12-14. TLC had the opportunity to appeal the claim construction ruling to the federal circuit, but did not. All of the elements of collateral estoppel are therefore present.

TLC also argues that the prior claim construction order should not be binding on the court because of several intervening Federal Circuit cases that have clarified that "the term 'circuit,' combined with a description of the function of the circuit connote[s] sufficient structure . . . to avoid § 112 ¶ 6 treatment." <u>Mass Inst. of Tech. v. Abacus Software</u>, 462 F.3d 1344, 1355 (Fed. Cir. 2006) (also stating that "the term 'circuitry,' by itself, connotes structure"); <u>Linear Tech. Corp. v. Impala Linear Corp.</u>, 379 F.3d 1311, 1320 (Fed. Cir. 2004) ("[W]hen the structure-connecting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112(6) presumptively will not apply."); <u>Apex</u>

Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1373 (Fed. Cir. 2003) ("The term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning . . . .").

Yet all of those cases were decided before Judge Seeborg issued his infringement decision and before TLC appealed the Northern District infringement decision to the Federal Circuit. TLC thus had ample opportunity to argue before either court that Judge Breyer's prior claim construction order incorrectly ruled that "circuit" was a means-plus-function limitation. Collateral estoppel will therefore apply and the court finds that the terms "circuit" and "circuitry" identified by the parties in the '411 and '412 patents constitute means-plus-function limitations.

E. Structures and Functions Related to "Circuitry"

Having determined that the terms "circuit" and "circuitry" at issue in the '411 reissue patent are means-plus-function limitations, the court must ascertain the claimed functions and their corresponding structures. See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1113 (Fed. Cir. 2002). A corresponding structure must be clearly linked to the claimed function, B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1424-25 (Fed. Cir. 1997), otherwise "the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112." Tech. Licensing Corp. v. Videotek, Inc., 545 F.3d at 1338 (quoting In Re Donaldson Co., 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc)). The court determines

whether adequate structure is disclosed from the perspective of one skilled in the art. See Intel Corp. v. VIA Techs., Inc., 319 F.3d 1357, 1356-66 (Fed. Cir. 2003).

Due to the complex and highly technical nature of the '411 and '412 patents, the court believes that appointment of a special master pursuant to Federal Rule of Civil Procedure 53 would be helpful and appropriate to assist the court in construing all means-plus-function claims at issue in the '411 and '412 patents.

III. Appointment of a Special Master

After having considered the fairness of imposing the likely expenses on, consulted with, and obtained the consent of the parties, the court will therefore appoint a special master pursuant to Federal Rule of Civil Procedure 53 to assist the court in construing the remaining patent terms at issue.

A. Appointment

Within thirty days from the date of this Order, the parties shall submit a statement indicating whom they have jointly upon agreed to serve as special master, and that person shall file within the same period an affidavit with the court pursuant to Rule 53(b)(3)(A). If the parties cannot agree on a special master, the parties shall submit a joint statement listing up to three of each party's preferred persons to serve as special master. The court will then select the special master from among those persons so listed. In naming a jointly selected or list of proposed candidates for special master, the parties must comply with Rule 53(a)(2).

The parties shall, in their joint statement, include a

statement providing for the basis, terms, and procedure for fixing the master's compensation as described in Rule 53(g). If the parties cannot agree on the basis, terms, and procedure for fixing the master's compensation, the joint statement shall include each party's proposed compensation basis, terms, and procedure.

The parties shall, in their joint statement, propose any changes or modifications to special master's authority as outlined in Rule 53(c) and duties that the court will outline below. The parties shall recommend to the court the circumstances, if any, in which the master may communicate ex parte with the court or a party, and the nature of the materials to be preserved and filed as a record of the master's activities.

B.  <u>Proposed Scope of Special Master Duties</u>

After receiving the parties' joint statement, the court will schedule a status conference to discuss, and agree upon, the final form the Order appointing the Special Master shall take, which shall include a statement of the scope of the Special Master's duties. The court proposes that those duties include:

1.  Determining the proper definition of one "of ordinary skill in the art";

Viewing the patents from the perspective of a person of ordinary skill in the art at the time of the invention,

2.  Determining whether the term "video type signal" as used in claims 19 and 25 of the '411 patent constitute means-plus-function limitations;

3.  If the special master finds that the term in (1) does constitute means-plus-function limitations,

|   |   |   |
|---|---|---|
| 1 |   | determining their functions and corresponding |
| 2 |   | structures; |
| 3 | 4. | Determining the functions and corresponding |
| 4 |   | structures for the terms "slicing means," "level |
| 5 |   | detecting means," and "sync restoring means" as |
| 6 |   | used in claim 6 of the '411 patent; |
| 7 | 5. | Determining and so construe any additional terms |
| 8 |   | the parties agree should be construed as having a |
| 9 |   | plain and ordinary meaning to one of skill in the |
| 10 |   | art; |
| 11 | 6. | Determining any additional term constructions on |
| 12 |   | which the parties agree; |
| 13 | 7. | Construing all disputed terms; |
| 14 | 8. | Identifying the functions and corresponding |
| 15 |   | structures for the terms "circuit" and "circuitry" |
| 16 |   | at issue in the '411 patent. |

In their joint report, the parties may suggest any duties or suggest any modifications to the proposed duties of the Special Master outlined above.

At the conclusion of the status conference, the court will prepare and file an Order of appointment, which the parties shall serve on the Special Master along with copies of their claim construction briefs, replies, oppositions, and exhibits.

C. <u>Further Proceedings</u>

The Special Master shall proceed with all reasonable diligence in conducting a <u>Markman</u> hearing and preparing for the court a report recommending constructions for the patent terms at issue. The parties will be afforded an opportunity to file any

objections to the Special Master's report, and if the court finds it helpful, oral argument on the objections may be scheduled. The court will thereafter issue a final claim construction order.

IT IS SO ORDERED.

DATED: March 9, 2010

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE